Case 209-0343 and 209-0382, Coleman Flooring v. DeGerald Counsel, please May it please the Court, Beth Dahlheide representing the appellant, Coleman Flooring Company For the sake of clarity, I'll make a distinction between the two cases before you on appeal by, for the sake of simplicity as well, referring to the back case since most of the primary issues before the Court relate to the back case and can be summarized by the broad question of whether the findings regarding accident, causal connection, and a wage differential are against the manifest weight of the evidence I'll begin with the accident issue in addressing why it was not proper for the Commission to consider anything in the proposed decision as part of the Record of Proceedings And I'll end with the wage differential issue by addressing why the arbitrator's denial of the request for bifurcation of the trial was improper To determine whether the findings of accident, causal connection, and wage differential award are against the manifest weight of the evidence, I acknowledge the test is whether the evidence is sufficient to support the Commission's finding and not whether a reviewing court might reach an opposite conclusion I maintain, however, there is not sufficient evidence to support the Commission's findings given the vast amount of conflicting evidence and two erroneous rulings to support the findings With respect to accident, the Commission relied on two things, the petitioner's testimony and the employer's proposed decision With respect to the proposed decision, I relied on Grant v. Trailmobile It's an Industrial Commission case and I submit that this court might want to take a look at whether or not that is an issue that could be decided by this court and settled because the Rule 7030.80a states the proposed decision must set forth all issues in dispute and the party's position on each issue and be written in the same manner and form not consistent with an arbitrator's written decision in Rule 7030.80b That section recites all things the arbitrator must include in their decision So basically, Commissioner Stevenson in Grant v. Trailmobile described the practice and he stated that proposed findings submitted to a trier of fact often represent a party's view of what he hopes the trier of fact will accept and not necessarily an acknowledgement of what's correct or what he wants So basically, you step into the arbitrator's shoes I think any practitioner would concede that when they are writing a proposed decision one of the things they weigh is the arbitrator they appeared before and what prior rulings are by that arbitrator So often, you actually, and this is what I think Commissioner Stevenson was putting forth you might write a decision that says a compromise and basically it's not ever an admission or a concession and I certainly put before this court that when the arbitrators made a statement saying that an accident occurred because respondent employer conceded that that was completely erroneous How about an accident occurred because the claimant said it did? And I think that's the second issue, if we take out a proposed decision What's wrong with it? Well, what's wrong with it is in some circumstances that's perfectly acceptable, Your Honor but there is, the case law does require that it be by preponderance of the credible evidence and in this case the petitioner went to a doctor and he testified that he went for a different condition on the day he alleged an accident and he said he felt good with no complaints whatsoever. I think that's pretty compelling evidence. Furthermore, when he continued to go to doctors, if anybody took the time and this is very fact intensive and very burdensome to go through but he treated for several months and he never said to any doctor I had a work incident. In fact, some histories, the first to Dr. Korincic for instance said that he had a gradually occurring pain that occurred in January and I think all of you probably have seen this very often where there's this confusion between repetitive trauma versus a specific incident. Then why does a claimant get on the stand and say absolutely not only did it happen that day but I told a witness that I didn't produce? And then he tried arguing later that the respondent should have produced the witness but he never proved that the witness was within our control and I maintain that also gets into that confused area between notice and accident just because you told a supervisor that day that's notice, it's not necessarily proof that an accident occurred. And I think it gets to the next point about causal connection because and I know I, excuse the vernacular, hammered it in my brief but his own orthopedic doctor said his MRI demonstrated no abnormalities and that gets into the third issue, the wage differential award because to prove a wage differential you have to prove a disability. The only disability here is pain complaints and that is bolstered by the RICFCE that the commission relied upon. However, there are two orthopedic doctors who both said that his MRIs demonstrated no abnormalities and I submit to this court that you're opening proverbial floodgates by saying anybody, I believe this case is a very clear case of manipulation and I think it's pretty obvious in the records. And you're telling a good attorney and good claimants who can do what they're told, you can prove your case by maintaining you have pain. How does his treating orthopedic doctor say his MRI demonstrates no abnormalities? And then I think another really telling point is this. He went to one chiropractor and then later on, hence the orthopedic sent him to another chiropractor, a guy named Dr. Sean Allen and there's, when I speak of the records, there was this e-mail exchange. Dr. Korincic tells chiropractor Allen that there were minimal findings on the ankle injury. Now, mind you, that initial ankle injury was a non-issue in this case until he starts going to Dr. Allen. In fact, when he first, that claim was not even filed until well into this back case. But Dr. Korincic wrote that there was minimal findings on the ankle MRI to Dr. Allen, yet when he was referred to Dr. Vargo, also of Hinsdale Orthopedic, she wrote that he needed a possible future ankle reconstruction. Now, judging from the amount of doctors and whatnot that this claimant saw, if he wanted surgery, could he not have litigated his ankle for benefits, for ankle reconstruction for benefits pursuant to Section 8A? I submit to this Court that surely he would have pursued that surgery vehemently if Dr. Vargo was doing anything but running up the litigation value of his case. Let's consider the argument in its basic form. Let's assume that there's a multitude of medical records that are based on subjective complaints. Let's assume that you're correct on that. Even if they lack corroboration, couldn't the commission find based on that alone? Do they need something beyond that? In a case of this magnitude, I will... As a matter of law, could they not decide that issue the same way based on their assessment of the credibility of the witnesses and the weight to be given to the other? That his pain exists, is that what you're inferring? I'm asking if there's some independent corroboration required. Well, I think that the totality of the record has to be taken into consideration. So yes, I think there is. And this is also a gentleman who asked for an FMLA leave of absence during dependency of his claim. And he went to Europe for three months. And then he came back and then he decided to go to RIC. And I think that the whole totality of the record really needs to be considered in order to find that. But the commission obviously heard all of this and weighed all of this, did they not? Well, I think this Court can still, even despite a deference that's normally the law, they have in certain cases reversed decisions. And the commission doesn't have to have total deference if the facts of the case warrant a reversal of the decision. Right. If an opposite conclusion is clearly apparent, then I think your point is well taken. And I think it is in this case. He testified that he wasn't even taking, he's not taking any drugs. He's not treating thereafter. And I go back to, because the bottom line of it is that the colon is seeking a reversal of a wage differential award. And I maintain that he does not have evidence of a disability. And there was certain evidence that was actually out and out ignored. It's one thing for the commission to weigh evidence, but when you rely on an FCE that later there's an addendum and you don't mention it in any of the findings, I think that's a problem. There was an addendum by the group that he saw at RIC that basically said what they saw did not comport with what he said. And if that's not a flag, I don't know what is. And then on top of that, they say six months he could be reassessed, blah, blah, blah. He goes back about six months later and sees Dr. Korenzic and she gives him a release to return to work full duty. And it's in the record that then we offered him his position back. And several months later, Dr. Korenzic writes a to whom it may concern letter with a CC to his attorney saying, oh, I meant return to work with restrictions per the RIC FCE. Why would she have released him? Is she in the habit of making mistakes? Why would you release him to return to work with no restrictions when, if he really had some obvious disability? This record begs for some scrutiny, and I'm not sure that it was given at the lower level. He also told his chiropractor doctor he was tiling at home. He had a baby during this case. Also, when he testified about his job search to get to the next point, that even if you're, there's two prongs to the wage differential, and that is that you're looking to prove disability, and then that you have found suitable alternate employment. He testified that he did, that he created a job search, and I asked him some questions. Did he bring the job search with him to the trial? No, I didn't bring it. I asked the arbitrator if we could bifurcate the trial. So the question before this court also is, when the rules governing the commission allow you to bifurcate a trial for good cause, why was that request denied? He gave, in some cases that would be enough, but he gave information to Dr. Grimm, who was the examining psychological doctor, and he gave information to RIC that he had had many kinds of different jobs earning $40,000 to $50,000 a year. So he gets on the stand and says, well, I found this job, boom, nothing else. I think that her not allowing the bifurcation of the trials so he could bring a job search, was also very prejudicial, and I think by looking outside the four corners of the record to find for an accident occurrence, that it just showed that, you know, basically there was a lot of evidence that was ignored in this case. There's some further evidence of manipulation, and I know they're enumerated in my brief. When he saw Dr. Lee from Midwest Orthopedics at Rush, Dr. Lee basically said he had a significant degree of symptom magnification and malingering, called him basically a manipulative phony. When he first went to the Midwest Orthopedics IME, he was supposed to see Dr. Holmes. There's a letter in the evidence that says, you know, he made a big deal over the fact that he had to look at some or sign a HIPAA paper, he wouldn't go to the IME in the office, he went out and called his attorney, and by the time he went back in, they couldn't see him. Very manipulated case, very, again, it's looking to open proverbial floodgates by I have pain, I can direct my case, I can do this. He went to Hinsdale Orthopedic, it's in the records, on referral from counsel. The letter, again, ceceded to counsel. Now he had to talk to his lawyer every step of the way. While you're certainly entitled to do that as a petitioner, I maintain that there's a very glaring thread of manipulativeness in this case. I'd like to ---- In every case where the complainant is testifying about subjective systems, where do we draw the line? You're saying the potential for manipulation is rife. Well, can't that argument be made in every case where there's subjective complaints? Your Honor, I can only say that I've been practicing for about 15 years in workers' camp, and I've never been before you before, or before this Court, I should say. Yes, I've had cases where people have subjective complaints, and you can depose pain doctors and they will say pain can be real. That's a matter of fact. But usually those cases are I had a back surgery, I had a failed back surgery, I had two or three failed back surgeries, or I've got an RSD, or you've got a frozen shoulder. You see it over and over. So he really, I go back to his doctor said, his ortho doctor said his MRI demonstrated no abnormalities. There gets to be a confusion between findings and symptoms. You usually see it the other way around. And in this case, it's almost as if when he found out he had findings, because there's an evidence in May of 04 where he goes to his doctor, in fact, they discharge him, and then that particular day he goes to Dr. Korentic. I mean, it's really, it's like, well, here's what you need to establish a wage differential, and I'm just going to scream and yell and then that's going to be it. There's very little to support that he's psychological side to his case. He went to like seven visits. Thank you. May it please the court. Counsel, my name is Richard Alexi. I'm here on behalf of Mr. DeTiro. It is obvious to me and I'm sure all the members of this court that counsel doesn't like my client, and if she were the arbitrator, she were the fact finder, she were the adjudicator, this guy, we wouldn't be standing here. Let's take a look at their evidence for a moment. Let's take a look at the respondent's side of the case, and let's see what we can conjure up, this manipulation that counsel has so fervently argued before you this morning. Number one, Mike Wagner, the foreman on the day of the injury, as certified by Beatrix Owens, their witness, person in charge of workers' compensation and other things, she testifies before the arbitrator, yes, he did report it to Mike Wagner on the morning it happened. Where was Mike Wagner? To refute all of this manipulative conjuring that my client had constructed from February 20th of 2004 and all the way through even today. Dr. Levine, Dr. Mark Levine, well-known compulsory medical examiner, well-known. He supports the conclusion that there was an accident, that there was causal connection, that there were anomalies. Counsel suggests and takes out of context one comment from a spine surgeon when he talked to my client in the hall and said there were no abnormalities in the MRI. Well, I mean, I could go to horse the record and say, well, there's no abnormalities that would warrant surgery, et cetera, et cetera, but I won't do that. Let's look at the MRI itself. It's an exhibit in the record. It says the MRI performed on March 12th, 2004 disclosed a far left herniation at L1, 2, and a left lateral protrusion at L4, 5. Objective evidence. Now, counsel wants this body to become a fact finder, a super fact finder, if you will, five great minds collecting together to decide the credibility of my client and all these witnesses. If the MRI is the gold standard for disability, well, then it makes everybody's life easier, right? Send everybody for an MRI. If there's no abnormalities, they got nothing. See ya. It's done. The state would save millions of dollars in adjudicators. We wouldn't need nine commissioners. We wouldn't need 31 arbitrators, et cetera. Obviously, that's not the case. In the decision that counsel so fervently, so vehemently has argued at the commission, at the circuit court, one of your fellow former colleagues, Justice Colwell was the presiding judge in this matter at the circuit court, the same argument was made then, the same argument that's made this morning. Three and a half pages of the arbitrator's decision lists categorically all of the evidentiary elements that she was relying on, and then she makes a comment that says the respondent as much as conceded the point of accident. The proposed decision, I would admit, here, this argument is a red herring, but it's akin to a closing argument. And if you're a trial judge and I get up in my closing argument and say, I know we fought fervently for this position, but I must concede that we would agree that there was this injury or there was this bill or there was this damage or there was this event. One other point. Counsel says, well, the guy's not taking any drugs, he's not taking any treatment. How would we know? How would she know? They stopped paying this guy when Julie Bowes, their case manager, who certified and worked and testified that she toiled to get him into the RIC program, admits that there's an FCE, she gets it. Do they stop at that point, the FCE that counsel so fervently argued was misleading and manipulated? No, they send her back to Mark Levine again. Mark Levine in June, second go-round, says, does he say he can work full duty? Does he say he can be a tile setter? Does he say he's manipulative? Does he say he's got five Waddell signs? Does he say anything about his character? No, he says he does have some employability functions. He doesn't say he can resume his former level of employment. What did they do when Julie Bowes, their witness, their case manager, their spy, their part of the adjusting function as found by Justice Freeman and Colby Bird, they stopped paying them. They just stopped paying them. Their own doctor says he can't go back to work. They say to her, their witness, and she admits this on cross-examination, that they said they couldn't give him a lighter duty job as they had in the past, so they just stopped paying them. And what does the commission do? Takes away all the penalties. Doesn't tell us why, contrary to what section 19 and 16 stand for, you know, commission changes or modifies the designation, blah, blah, blah, whatever. Blah, blah, blah, I know that's a term of art. The bottom line is, gentlemen, and with all due respect to my opponent, I know she's toiled on this case diligently for many, many years. The manifest weight of the evidence clearly support that there is enough evidence in Dr. Schuett's records, Dr. Starr's records, Dr. Kozlowski's records, Dr. Korincic's records, Dr. Lorenz's records, Dr. Levine's opinions, Dr. Petra Joseph from RIC, that this man, sustained in injury, is incapable of returning to a job as a tile setter. And found accommodated employment within the meaning of section 8D1. This decision should be informed, affirmed in total. Thank you. Your Honor, I think that most of those points were already argued in my brief. I'll defer to that and not waive any of the other arguments. I think one last point, though, when Counsel Tuck brought out the MRI and made his point about we wouldn't need to go any further, this claimant did have an EMG, MCV, and a CT scan that were all negative. I rest my case on that. The arbitrator really did not go into any detail. She basically said she based it on the medical records. And then really didn't explain. Maybe I'm looking at the wrong records. But am I correct, we had an MRI sometime in March or early April of 2004 that showed significant abnormalities at L45 disc and concluded that there was sciatica. That was Schuett's interpretation of the MRI? Yes. Did she have a contrary interpretation of the MRI that didn't show that? I know that the record shows that Dr. Levin ordered a second MRI that said... Okay, well, I'm going to get through a few more of them. In May of 2004, Korincic's records say she reviewed the records, conducted a physical examination, had an impression of lumbar herniations, far-left lateral L12 status, post-2 epidural injections at L12, postural abnormalities and muscle imbalances secondary to myofascial pain syndrome, lumbosacral area, and acute L45 radicular pain from L12 referred to the left groin. She wrote that in her records. On which date, Your Honor? May? May of 2004. When she first saw him, she was looking at a radiology report. Dr. Schuett's a rheumatologist at Illinois Bone and Joint. Okay, June of 2004, there was a CT scan performed, I think on June the 26th, revealed an old fracture, but also noted it may be related to a traumatic injury. He had a car accident in June. Showed a mild bulging at L45, L5S1, and an EMG and an NCV of the lower plane determined that they were normal. When Dr. Lorenz, when he stopped him in the hall and that note is there, I want to say that was August 25th, 2004, and I think that was after they had Dr. Schuett was looking at him for kind of vague pain complaints and they ran tests. It's true, the radiologist, I do not deny that the radiologist wrote that there were findings, but it goes back to the confusion between findings and when you, that's why we go, that's why in fact Dr. Schuett referred him to a spine specialist. Instead of going to a spine specialist, he went to a pain doctor. And then Dr. Kremzig's notes reflect that he came to her, it was a second pain doctor, a referral from counsel to, you know, he referenced Dr. Levin being a... Dr. Joseph at the Research Institute in L5 claims that there was evidence of active radicopathy or dural tension signs for most of his stay at the Research Institute. I thought the record said that he, in the addendum, he said he did not observe those signs for most of his stay. That's what the record, and I don't want to correct you, but I'm pretty positive. Thank you.